1 | Christopher B. Dolan, Esq. (SBN 165358)
THE DOLAN LAW FIRM
2 | 1438 Market Street
San Francisco, California 94102
3 | Tel: (415) 421-2800
4 | Fax: (415) 421-2830

5 | Attorneys for Plaintiffs
JAHI MCMATH and
6 | NAILAH WINKFIELD

7

8 | **UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9 | JAHI MCMATH, a minor; NAILAH ) Case No.
10 | WINKFIELD, an individual, as parent, as )
guardian, and as next friend of JAHI )
11 | McMath, a minor ) **COMPLAINT FOR DECLARTORY**
) **AND INJUNCTIVE RELIEF**
12 | Plaintiffs, )
)
13 | v. ) 1. **Civil Action for Deprivation of Civil**
) **Rights in Violation of 42 U.S.C. §**
14 | ) **1983: Violation of the Right to Due**
STATE OF CALIFORNIA; ) **Process of Law Guaranteed Under the**
15 | COUNTY OF ALAMEDA; ) **Fifth and Fourteenth Amendments of**
) **the United States Constitution.**
16 | ALAMEDA COUNTY DEPARTMENT OF ) 2. **Civil Action for Deprivation of Civil**
PUBLIC HEALTH; ) **Rights in Violation of 42 U.S.C. §**
17 | MUNTU DAVIS, MD, MPH, individually ) **1983: Violation of the Free Exercise**
) **Clause of the First Amendment of**
18 | and in his capacity as ALAMEDA ) **the United States Constitution**
COUNTY PUBLIC HEALTH )
19 | DEPARTMENT DIRECTOR & HEALTH ) 3. **Civil Action for Deprivation of Civil**
) **Rights in Violation of 42 U.S.C. §**
20 | OFFICER; ) **1983: Violation of the Right to**
) **Privacy Guaranteed Under the Fourth**
21 | ALAMEDA COUNTY CORONER & ) **and Fourteenth Amendments of the**
MEDICAL EXAMINER; ) **United States Constitution**
22 | ALAMEDA COUNTY COUNSEL; ) 4. **Violation of Section 504 of The**
) **Rehabilitation Act of 1973 (29**
DAVID NEFOUSE, individually and his ) **U.S.C. § 794)**
23 | capacity as DEPUTY ALAMEDA ) 5. **Violation of The American's With**
) **Disabilities Act 42 U.S.C. § 12101 et**
24 | COUNTY COUNSEL; ) **seq.**
SCOTT DICKEY, individually and in his ) 6. **Violation of the Religious Land Use**
25 | capacity as DEPUTY ALAMEDA ) **and Institutionalized Persons Act**
) **(42 U.S.C. § 2000cc et seq.)**
26 | COUNTY COUNSEL; ) 7. **Petition for Declaratory Relief**
ALAMEDA COUNTY CLERK- ) **(28 U.S.C. § 2201 et seq.)**
27 | RECORDER'S OFFICE; ) 8. **Petition for Declaratory Relief**
) **(28 U.S.C. § 2201 et seq.)**
28 |

1.

| | |
|---|---|
| 1 | PATRICK O'CONNELL, individually and in his capacity as ALAMEDA COUNTY CLERK-RECORDER; |
| 2 | |
| 3 | ALAMEDA COUNTY SHERIFF'S OFFICE; |
| 4 | JESSICA D. HORN, individually and in her capacity as ALAMEDA COUNTY |
| 5 | DEPUTY SHERRIFF; |
| 6 | CALIFORNIA DEPARTMENT OF |
| 7 | PUBLIC HEALTH; |
| 8 | TONY AGURTO, MPA, individually and in his capacity as STATE REGISTRAR AND |
| 9 | ASSISTANT DEPUTY DIRECTOR AT |
| 10 | CENTER FOR HEALTH STATISTICS AND INFORMATICS, CALIFORNIA |
| 11 | DEPARTMENT OF PUBLIC HEALTH; |
| 12 | KAREN SMITH, MD, MPH, individually and in her capacity as CALIFORNIA |
| 13 | DEPARTMENT OF PUBLIC HEALTH |
| 14 | DIRECTOR AND STATE PUBLIC HEALTH OFFICER; and DOES 1-100, |

PETITION FOR INJUNCTIVE AND
DECLARATORY RELIEF

Defendants.

_____/

Plaintiffs, and each of them, allege the following:

## SUMMARY

1.    Jahi McMath (hereinafter "JAHI") is a 15 year old girl.  She is the daughter of Nailah
Winkfield (hereinafter "WINKFIELD").  On December 9th, 2013, following a tonsillectomy
and adenoidectomy performed at Children's Hospital Oakland (hereinafter "CH" – now a part
of UCSF Benioff Children's Hospital), which WINKFIELD had been informed would be
"routine," JAHI woke from what was described as a successful surgical procedure and was
transported to the recovery suite. JAHI emerged from the anesthesia and was able to
communicate with her mother through writing.  She was given a grape Popsicle by the nursing

staff, and, shortly thereafter, she began bleeding from her mouth. WINKFIELD asked for assistance and was told this was normal. As increasing amounts of blood flowed from JAHI's mouth WINKFIELD was given more towels, a small bucket, and other items to catch the ever expanding volume of JAHI's blood loss.

2.  WINKFIELD, expressing her concern, was repeatedly told that this was "normal" by the CH staff.

3.  JAHI wrote to her mother that she was afraid and WINKFIELD tried to comfort her.

4.  Finally WINKFIELD, not getting satisfactory attention from the staff at CH, called her mother, a registered nurse, to come and survey the situation.

5.  When WINKFIELD's mother saw the amount of blood loss and the condition of JAHI, she immediately demanded a doctor to treat JAHI and, about that time, JAHI suffered cardiac arrest because of the massive loss of blood volume.

6.  Following extensive CPR, and administration of blood, blood products and fluids to try and restore JAHI's lost blood volume, JAHI's heart started beating again. She was placed on a ventilator to assist her with respiratory support.

7.  Because of the extreme blood loss, and the period in which JAHI's brain was not receiving proper oxygen, she suffered a severe brain injury which included swelling of the brain.

8.  On December 12, 2013, Doctors at CH pronounced JAHI "brain dead".

9.  Without WINKFIELD's permission, CH notified the California Transplant Donor Network that JAHI's organs could be available for harvesting and transplantation and information was then circulated to advise transplant facilities that organs, of JAHI's blood type, might shortly be available.

10.  Employees of Children's Hospital then began pressuring WINKFIELD to sign documents

3.

allowing CH physicians to harvest JAHI's organs while she was on ventilator support and her heart was still beating. WINKFIELD told these employees to leave her alone, that she was not signing. They continued to persist even following WINKFIELD into the chapel, where she was going to pray, to try and persuade her to allow CH physicians to end JAHI's life by harvesting her organs.

11.    After an intense legal battle, The Honorable Judge Evelio Grillo, considering the information then available, ruled on December 23, 2013, that JAHI McMath met the criteria for Brain Death under California Health and Safety Code 7180 and rejected pleas from WINKFIELD that her daughter be provided with a feeding tube and a tracheostomy so as to provide nutrition and improved ventilator support, and to order CH to continue her ventilator support. Judge Grillo ruled that CH did not have to place the feeding tube, perform a tracheostomy or continue ventilator support but entered two stays of the Order so that WINKFIELD could file appeals and/or a federal suit.

12.    WINKFIELD filed an appeal as well as a Federal Lawsuit in the U.S. District Court for the Northern District of California. Following negotiation under the supervision of U.S. Magistrate Judge Donna M. Ryu, criteria for JAHI's removal from CH were established. These included a demand by CH that JAHI be declared dead, that a death certificate be issued, that CH surrender JAHI to the Alameda County Coroner who would, pursuant to a "Disposition Permit," then release JAHI to her mother for transport to a different medical facility.

13.    Before CH could disconnect JAHI from her ventilator and end her existence, WINKFIELD and her lawyers were able to arrange her transfer to a health care facility in New Jersey where, pursuant to that state's laws, there is a religious exemption to brain death. There JAHI was

4.

1  treated with dignity and provided care, including the previously requested feeding tube and

2  tracheostomy as well as antibiotic treatment for the infections which CH had allowed to

3  develop and go untreated.

14.  JAHI now remains in New Jersey where she receives minimal in-home support.  She is in

excellent health, with no skin or organ breakdown, and where she has irrefutable brain

function including recognition of her mother's voice and movement in response to specific

commands such as "move your third finger."

15.  WINKFIELD and her attorneys have presented this evidence to both state and county

agencies and officials, pursuing whatever avenues are available for reconsideration and

correction of her diagnosis of death.  They have presented legally admissible evidence that at

this time JAHI has function of numerous portions of her brain.

16.  Therefore, despite there possibly having being evidence in December of 2013 that JAHI

met the criteria for brain death, currently JAHI is not brain dead. Therefore, her possible

cessation of brain function in December, 2013, was not irreversible.

17.  These government agencies and officials have failed to provide any process or avenue for

WINKFIELD to make prove that she is not brain dead and have summarily, without any

hearing, denied to even consider whether JAHI does not meet the criteria for brain death and is

therefore alive.

18.  WINKFIELD, a loving and committed mother has known, all along, that her daughter is

not dead.  Despite Declarations of CH medical staff that JAHI would, as a brain dead

individual, begin to show signs of decomposition, that her brain would liquefy, and that her

body would physically shut down, JAHI's brain has not liquefied, her organs have not failed,

she has not decomposed, and she is able to recognize her mother's voice and purposefully

5.

1    respond to command.

2    19.    WINKFIELD has given up everything for her daughter; her home, job, social network and

3    support system. WINKFIELD wishes to have her daughter's basic human right, to life,

4    restored to her so that she can return to California, and specifically Oakland, the place where

5    WINKFIELD and JAHI were born and raised, to be surrounded by the love and support of

6    their family. As it is presently, should JAHI leave New Jersey, and its protections provided by

7    New Jerseys religious exemption to brain death, she could be refused treatment, unplugged,

8    even shot, without repercussion as she is legally dead in California.

10   20.    JAHI is beautiful young woman who suffered a tragic injury. But she is not dead. JAHI is

11   alive. JAHI is entitled to the same rights and privileges of all living persons suffering a

12   disability under state and federal law. It is incumbent upon the U.S. District Court to exercise

13   its constitutional and statutory powers and rectify this injustice.

15                                  **JURISDICTION**

16   21.    Counts in this Action arise out of the First, Fifth and Fourteenth Amendments to the

17   United States Constitution, The Rehabilitation Act of 1973 (29 U.S.C. § 794) and The

18   American's With Disabilities Act 42 U.S.C. §12101 et seq., 42 U.S.C § 1983, and The

19   Religious Land Use and Institutionalized Persons Act (42 U.S.C. § 2000cc et seq.). The

20   declaratory and injunctive relief sought is authorized by 28 U.S.C. § 2201 and 2202, and Rule

21   57 of the Federal Rules of Civil Procedure.

23   22.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. Sections 1331 and 1343.

24                                     **VENUE**

25   23.    Venue is proper in the United States District Court for the Northern District of California,

26   pursuant to 28 U.S.C. sections 84 and 1391. The events that gave rise to this complaint

28                                        6.

occurred in this judicial district, and one or more of the defendants is located/resides in or has its Principal Place of Business in this judicial district.

## INTRADISTRICT ASSIGNMENT

24.     The actions that give rise to this complaint occurred in Oakland, Alameda County, California.  Assignment of this action to the Oakland Division of this Court is appropriate according to Local Rule 3-2(d).

## PARTIES

25.     JAHI is a minor and a citizen of the United States of America.

26.     WINKFIELD is an adult and a citizen of the United States of America. She is the mother of JAHI McMath.  Pursuant to the California Family Code § 6910 she is and was at all times pertinent to this complaint the healthcare decision maker for JAHI McMath, a minor.

27.     Defendant STATE OF CALIFORNIA is the legal and political entity required by the California Constitution and pertinent statutes to maintain and oversee all vital records of all persons born in and who die in the California.

28.     Defendant COUNTY OF ALAMEDA is a legal and political entity located within the state of California. It is required by the California Constitution and pertinent statutes to create and to ensure the accuracy of documentation of certain vital statistics, including but not limited to Certificates of Death, for certain events which occur within the confines of Alameda County, California.

29.     The Alameda County Department of Public Health is a subdivision of the County of Alameda.

30.    Muntu Davis, MD, MPH is an employee of the County of Almeda and at all times pertinent to this complaint was acting in his official capacity as Director and Health Officer of the Alameda County Public Health Department.

31.    The Office of the Alameda County Counsel is a subdivision of the County of Alameda. It is required by statute to evaluate applications for the correction of documentation of certain vital statistics, including but not limited to Certificates of Death.

32.    David Nefouse is an employee of the Alameda County Counsel's office. At all times pertinent to this complaint he was acting in his official capacity as Deputy Alameda County Counsel.

33.    Scott Dickey is an employee of the Alameda County Counsel's office. At all times pertinent to this complaint he was acting in his official capacity as Deputy Alameda County Counsel.

34.    The Alameda County Clerk-Recorder's Office is a subdivision of the County of Alameda. It is required to create and to ensure the accuracy of documentation of certain vital statistics, including but not limited to Certificates of Death, for certain events which occur within the confines of Alameda County, California.

35.    Patrick O'Connel is an employee of the Alameda County Clerk-Recorder's office. At all times pertinent to this complaint he was acting in his official capacity as an employee of the Alameda County Clerk-Recorder's office.

36.    The Alameda County Sheriff's Office is a subdivision of the County of Alameda. It is required to create and to ensure the accuracy of documentation of certain vital statistics,

8.

including but not limited to Certificates of Death, for certain events which occur within the confines of Alameda County, California.

37.     Jessica D. Horn is an employee of the Alameda County Sheriff's Office, whose electronic signature appears on Certificate of Death number 002381866. At all times pertinent to this complaint she was acting in her official capacity as an employee of the Alameda County Sheriff's Department.

38.     The California Department of Public Health is an agency of the State of California. It is required by the California Constitution and pertinent statutes to create and to ensure the accuracy of documentation of certain vital statistics, including but not limited to Certificates of Death, for certain events which occur within California.

39.     Tony Agurto, MPA, is an employee of the California Department of Public Health or of one of its subdivisions. At all times pertinent to this complaint he was acting in his official capacity as an employee of the California Department of Public Health or of one of its subdivisions.

40.     Karen Smith, MD, MPH, is the Director of the California Department of Public Health and State Public Health Officer. At all times pertinent to this complaint she was acting in her capacity as an employee of the California Department of Public Health or of one of its subdivisions.

41.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sue these defendants by such fictitious names and capacities. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that

9.

plaintiffs' injuries as herein alleged were proximately caused by the actions and/or in-actions of said Doe defendants. Plaintiffs will amend this complaint to include the true identities of said doe defendants when they are ascertained.

42.     At all times relevant hereto, each of the named defendants was an employee or acting as the agent, principal, employee, and/or employer of one or more of the remaining defendants and was, at all times herein alleged, acting within the purpose, course, and scope of such agency and/or employment for purposes of respondent superior and/or vicarious liability as to all other defendants.

43.     At all times relevant hereto, all defendants acted under color of state law.

## STATEMENT OF FACTS

44.     Plaintiff incorporates by reference as if fully set forth herein the contents of Paragraphs 1-28 as if fully set forth herein.

45.     At all times pertinent to this complaint, CHO was an "institution" as defined by 42 U.S.C. § 1997 et seq. At all such times, JAHI has had, and continues to have, "a physical or mental impairment that substantially limits one or more of [JAHI's] major life activities" (42 U.S.C. § 12102).

46.     At all times from December 9, 2013, through January 4, 2014, JAHI resided in, was institutionalized in, and was confined to CHO.

### The California Standard For Determination of Death Has Not Been Satisfied Because Jahi McMath Has Ongoing Brain Function

47.     California Health and Safety Code § 7180, the "Uniform Determination of Death Act," in force and effect, at all times material to this action provides that "An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2)

10.

*irreversible cessation* of *all functions of the entire brain*, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards." (Emphasis added.)

48. California Health and Safety Code § 7181, "Confirmation of Death," provides that an individual can be pronounced dead by a determination of "*irreversible cessation* of *all functions of the entire brain, including the brain stem*." (Emphasis added.) Such a determination of "brain death" requires "independent confirmation" by at least two physicians.

49. These statutes are silent as to what "accepted medical standards" are to be applied.

50. These statutes provide no process by which a person declared brain dead at one time can have new and additional evidence presented demonstrating that the conditions which existed at the moment in which brain death was diagnosed, have changed such that the person no longer meets the criteria for brain death as they have regained brain function.

51. The difficulty presented by this statute and by these facts is that medical science is not aware of any group of persons who have survived for any period of time after a declaration of brain death. Persons declared brain dead almost always soon thereafter either after being removed from the ventilator by their families or the medical institutions in which they reside, or they suffer cardiac death due to their severe brain damage/brain death. Likewise, there is no known clinical cohort population of adolescents who were declared brain dead but survived such a declaration. Children's brains are still developing and are thought by many to have much greater neuroplasticity than those of adults. In short, there has never been a case like JAHI's ever before in the history of The United States' medical or judicial system.

52. The legal standard to be applied to the trier of fact making a legal determination of a person's having suffered "*irreversible cessation* of functions of the entire brain, including the

11.

brain stem" is nowhere defined in California's Determination of Death statutes.

53.     These statutes also are silent as to the point at which a determination of "brain death" can be made and as to the effect on a determination of "brain death" of a person's developing at some future date evidence of brain activity.

54.     JAHI did not suffer at any time the "irreversible cessation of circulatory and respiratory functions," nor has she ever suffered an *"irreversible* cessation of functions of the entire brain, including the brain stem." JAHI's heart and brain continue to function.

55.     WINKFIELD obtained a death certificate under protest as that was the only way she could remove her daughter from CH.  CH demanded that JAHI be issued a death certificate before they would release JAHI to the County Coroner who then could release her to WINKFIELD pursuant to a Disposition Permit which is usually employed by members of particular faiths who have pre-burial religious rituals which are performed on the bodies of the deceased.

**Plaintiff WINKFIELD's Exercise of Her Firm And Sincere Religious Belief Faith Guided Her Determination To Prevent Her Daughter's Life From Being Terminated**

56.     Plaintiffs are Christians with firm and sincerely held religious beliefs that as long as a person's heart is beating, that person is alive.

57.     These religious beliefs include a conviction requiring the provision of all treatment, care, and nutrition to a body that is living, treating it with respect, and seeking to encourage its healing.

58.     Plaintiffs' religious beliefs are also informed by WINKFIELD's personal knowledge of at least one person other than her daughter who had been diagnosed as brain dead, where the decision makers were encouraged to "pull the plug" yet refused, and thereafter their loved one emerged from legal "brain death" to a state where they had brain function.

12.

59.     In December, 2013, WINKFIELD, despite having made her and her child's religious convictions clear to the physicians treating JAHI, was informed that, since CHO physicians had pronounced JAHI dead, WINKFIELD had no right to exercise any decision making authority regarding her daughter's medical care.

60.     She was informed that if CH staff would remove all life support measures from her daughter, thereby to a reasonable degree of medical certainty, immediately causing a cessation of all her child's cardiac, pulmonary, and neurologic function.

61.     Such a cessation would have resulted in JAHI's death according to Plaintiffs' genuinely held religious beliefs thereby preventing Plaintiffs from exercising their right to exercise their religious beliefs.

62.     Faced with this threatened withdrawal of life support from her daughter, Plaintiff WINKFIELD was forced to resort to the California State Court System (Superior Court) to request a restraining prohibiting CH from "pulling the plug" on JAHI.

63.     The Superior Court of Alameda County, the Hon. Evelio Grillo presiding, pursuant to this action, issued a Temporary Restraining Order preventing CH from removing JAHI from the ventilator on which she was dependent for adequate oxygenation of her tissues.

64.     With time running out on the Temporary Restraining Order, and in order to stop CH from terminating JAHI's ventilator support, WINKFIELD filed a complaint in this Court seeking injunctive relief. (Case number 4:13-cv-05993-SBA).

65.     CH, before filing an answer to the complaint in case number 4:13-cv-05993-SBA, in an agreement which was brokered by and approved by a U.S. Magistrate Judge of the Northern

13.

District of California, agreed to comply with the most important of Plaintiff WINKFIELD's demands.

66.     This agreement required that CH allow WINKFIELD to remove her daughter from CH and to determine what medical care her daughter JAHI would receive; consistent with both Plaintiffs securely held religious beliefs.

67.     This agreement, in consideration of the Stay issued by Judge Grillo, allowed WINKFIELD a limited amount of time to secure the removal of her daughter from CH in order to avoid the withdrawal of necessary life support measures, thereby placing an extreme amount of duress on WINKFIELD in the succession of events which soon thereafter ensued and which resulted in the issuance of a facially deficient and incomplete "Certificate of Death", attached hereto as Exhibit "A."

68.     Prior to allowing JAHI to leave its facility, CH insisted that the Alameda County Coroner issue a "Disposition Permit," allowing WINKFIELD take her daughter from the hospital.

69.     In January, 2014, when WINKFIELD went to the Vital Records Division of the Alameda County Clerk-Recorder's Office to obtain this paperwork, she was told that no "Disposition Permit" could be issued until a Death Certificate had been issued by the Coroner's Office.

70.     Deputy Health Officer, Dr. Erica Pan, who was covering for Dr. Muntu Davis, MD, MPH, the Director and Health Officer of the Alameda County Public Health Department, initially refused to issue either the Death Certificate or the Disposition Permit, because, at that time, JAHI's heart was still beating and she was being maintained on ventilator support.

71.     At that time, WINKFIELD was informed that Dr. Pan's refusal stemmed, at least in part from her medical opinion, and her past experience, that someone on a ventilator, i.e., someone in JAHI's condition, had never been declared dead over the objection of her next of kin, so

14.

long as that person was on a ventilator with a beating heart.

72.    Ultimately, without either Dr. Pan's or Dr. Davis having personally examined JAHI, under the extreme duress which resulted from the fact that the restraining order which prohibited CHO from removing JAHI from a ventilator rapidly was running out, and solely to ensure that her daughter was not taken off life support, WINKFIELD, through counsel, arranged for the issuance of the paperwork which CH and the Alameda County Public Health Department indicated was absolutely required to allow WINKFIELD to obtain a Disposition Permit so as to remove JAHI from CH before she died of medical neglect.  Jahi had not been given any nutrition for over three weeks and no effort was being engaged in to improve her physical health.

73.    This required paperwork included a purported "Certificate of Death" number 002381866 (Exhibit A), which was issued by The Office of Clerk-Recorder, County of Alameda, and which is a Vital Record of the State of California, dated 1/3/2014, which did not contain any attestation of a physician who ever was in attendance of JAHI, gave 12/12/2013 at 15:00 as JAHI's time of death. Indeed there is no signature, only a computer generated reference to Dr. Muntu Davis who was not even present at the time the Death Certificate was printed.

74.    At the time when this "Certificate of Death" was printed JAHI was institutionalized at CH.

75.    The issuance of this "Certificate of Death" immediately (but for the existence of the State Court Restraining order) allowed any physician licensed in California to withhold any and all medical treatment, including ventilator support, from JAHI, thereby placing a "substantial burden on the religious exercise of [JAHI and WINKFIELD] a person residing in or confined to an institution" (42 U.S.C. § 2000cc), given that their genuinely held religious beliefs, and the exercise thereof, called for the provision of medical treatment as long as JAHI had a

15.

spontaneous heartbeat as she was, in WINKFIELD's eyes and beliefs, alive.

**California Law Governing The Issuance Of A Certificate of Death For Jahi McMath**

**Was Not Followed, And JAHI's Death Certificate Is Invalid On Its Face**

76.     Certificates of Death are governed by California Health and Safety Code Sections 102775 et seq., which make numerous, specific requirements for the issuance of a valid death certificate.

77.     California HSC § 102775 states in its entirety that "[e]ach death shall be registered with the local registrar of births and deaths in the district in which the death was officially pronounced or the body was found, within eight calendar days after death and prior to any disposition of the human remains."

78.     Certificate of Death number 002381866 was not registered until more than eight calendar days after the date which it cites as the date of JAHI's death, in violation of California HSC § 102775.

79.     California HSC § 102795 states in pertinent part that "[t]he medical and health section data and the time of death [required to be included in a valid death certificate] shall be completed and attested to by the physician and surgeon last in attendance.

80.     Certificate of Death number 002381866 does not contain "medical and health section data" or a "time of death" which was completed and attested to by the physician or surgeon last in attendance of JAHI McMath prior to 15:00 pm on December 12, 2013. Indeed there is no identification of any such physician or surgeon anywhere on JAHI's Death Certificate.

81.     California HSC § 102800 states in its entirety that "The medical and health section data and the physician's or coroner's certification shall be completed by the attending physician

within 15 hours after the death, or by the coroner within three days after examination of the body. The physician shall within 15 hours after the death deposit the certificate at the place of death, or deliver it to the attending funeral director at his or her place of business or at the office of the physician."

82.    Certificate of Death number 002381866's medical and health section data was not completed by any person within 15 hours after 15:00 pm on December 12, 2013.

83.    Certificate of Death number 002381866's medical and health section data was not completed within three days of examination of JAHI McMath, by the Alameda County Coroner.

84.    Certificate of Death number 002381866 was not deposited within 15 hours of 15:00 pm on December 12, 2013 at any place, nor was it ever delivered to an "attending funeral director" at any location.

85.    California HSC § 102875(a) states in pertinent part that "the physician and surgeon last in attendance ... on a deceased person on a deceased person shall state on the certificate of death the disease or condition directly leading to death, antecedent causes, other significant conditions contributing to death and any other medical and health section data as may be required on the certificate; he or she shall also specify the time in attendance, the time he or she last saw the deceased person alive, and the hour and day on which death occurred."

86.    California HSC § 102125 states in its entirety: "All certificates of live birth, fetal death, or death shall be written legibly, in durable black ink, and a certificate is not complete and correct that does not supply all of the items of information called for, or satisfactorily account for their omission."

87.    On its face, Certificate of Death number 002381866 does not satisfy the requirements of

17.

HSC § 102125, since numerous blanks are left empty with no "satisfactory account" being given "for their omission."

88.    Certificate of Death number 002381866 contains no statement whatsoever made by "the physician and surgeon last in attendance" on JAHI McMath prior to 15:00 pm on December 13, 2013.

89.    More specifically, Certificate of Death number 002381866 violates HSC § 102875(a) and thereby is facially deficient as it contains no statement made by "the physician and surgeon last in attendance" on JAHI McMath prior to 15:00 pm on December 13, 2013, which describes any of the following:

        a.    the disease or condition directly leading to the death which Certificate of Death number 002381866 purports to document,

        b.    the antecedent causes of the death which Certificate of Death number 002381866 purports to document,

        c.    other significant conditions purportedly contributing to the death which Certificate of Death number 002381866 purports to document,

        d.    and any other medical and health section data which were legally required to be included on the deficient certificate,

        e.    a specification of the time when the "attending physician and surgeon last in attendance" on JAHI was in attendance,

        f.    a specification of the time when he or she last saw JAHI McMath prior to 15:00 pm on December 12, 2013,

        g.    the hour at which the death which Certificate of Death number 002381866 purports to document allegedly occurred, or

18.

h.      the day on which death the death which Certificate of Death number 002381866 purports to document allegedly occurred.

90.     California HSC § 102875(b) further requires that a valid Certificate of Death: "shall contain ... all of the following items: (1) [The] disease or conditions leading directly to death and antecedent causes; (2) Operations and major findings thereof; (3) Accident and injury information; and (4) Information indicating whether the decedent was pregnant at the time of death."

91.     Certificate of Death number 002381866 does not contain any of the items described above, each of which is specifically required to be included in a valid Certificate of Death by HSC § 102875(b).

92.     More specifically, Certificate of Death number 002381866 violates HSC § 102875(b) and thereby is facially deficient as it contains no statement made by any authorized person, which describes any of the following:

a.      any operations performed on JAHI;

b.      any major findings of any operations performed by JAHI;

c.      any information regarding any accidents sustained by JAHI;

d.      any information regarding any injuries sustained by JAHI;

e.      or any information indicating whether JAHI McMath was pregnant at 15:00 pm on December 12, 2013.

93.     California HSC § 10285 states in pertinent part: "The physician and surgeon last in attendance ... on a deceased person shall state on the certificate of death the disease or condition directly leading to death, antecedent causes, other significant conditions contributing to death and any other medical and health section data as may be required on the certificate; he

19.

or she shall also specify the time in attendance, the time he or she last saw the deceased person alive, and the hour and day on which death occurred, except in deaths required to be investigated by the coroner. ...

A physician and surgeon may designate, one or more other physicians and surgeons who have access to the physician and surgeon's records, to act as agent for the physician and surgeon for purposes of the performance of his or her duties under this section, provided that any person so designated acts in consultation with the physician and surgeon."

94.   Certificate of Death number 002381866 is deficient on its face, as sections 115-118 ("Physician's Certification") are all left blank.

95.   Certificate of Death number 002381866, in violation of California HSC § 10285, was not signed by "[t]he physician and surgeon last in attendance" on JAHI, nor does it "specify the time [any such physician was] in attendance [or] the time he or she last saw [JAHI] alive."

96.   WINKFIELD is informed and believes and thereon alleges that at no time did any such "surgeon or physician [last in attendance] designate, one or more other physicians and surgeons who have access to the physician and surgeon's records, to act as agent for the physician and surgeon for purposes of the performance of his or her duties under" HSC § 10285. This is supported by the fact that there is no attestation by the attending physician or his or her designee as required by law.

97.   Thus, based solely on information which was available no later than January, 2014, the Alameda County Office of Clerk-Recorder issued an incomplete and facially insufficient Certificate of Death which did not contain a Physician's Certification, a Cause of Death, or a description of any injuries that were purported to have led to the death of JAHI.

98.    The defects cited above are substantive and not mere "formalities" about which to quibble.

99.    For the past two years, JAHI has been loved and cared for by WINKFIELD and her family as well as various medical professionals in New Jersey, which recognizes the religious beliefs of a putative decedent.  The New Jersey Uniform Declaration of Death Act states:

"The death of an individual shall not be declared upon the basis of neurological criteria pursuant to sections 3 and 4 of this act when the licensed physician authorized to declare death, has reason to believe, on the basis of information in the individual's available medical records, or information provided by a member of the individual's family or any other person knowledgeable about the individual's personal religious beliefs that such a declaration would violate the personal religious beliefs of the individual. In these cases, death shall be declared, and the time of death fixed, solely upon the basis of cardio-respiratory criteria."

100.    During the past two years, JAHI has exhibited numerous signs of brain function and activity.

101.    These signs have been observed on many separate dates, by numerous nurses and physicians, and by JAHI's family and other lay observers of her condition.

102.    These signs include but are not limited to:

    a)    electroencephalographic evidence of brain function;

    b)    arteriographic evidence of blood flow to the brain;

    c)    Magnetic Resonance Imaging evidence of intact brain structure and intracranial blood flow;

    d)    Magnetic Resonance Arteriography evidence of intact brain structure and intracranial blood flow;

    e)    bispectral index evidence of brain function;

21.

f)      the onset of menstruation, which require hormones which are secreted by the hypothalamic portion of the brain;

g)      the development of secondary sex characteristics, which require hormones which are secreted by the hypothalamic portion of the brain;

h)      intermittent purposeful responsiveness to verbal commands;

i)      the ability to thermoregulate;

j)      intestinal function; and

k)      the ability of her skin to maintain its homeostatic functions.

103.    The appearance of these signs does not appear to have been anticipated by any of the physicians who testified to or submitted declarations to the California court in December, 2013, including Dr. Heidi R. Flori, M.D., the then Medical Director of the Pediatric Intensive Care Unit at CH, who opposed Plaintiffs' attempts to required CH to provide ongoing medical care to JAHI.

104.    Dr. Flori stated under penalty of perjury, on January 3, 2014, that at that time, her opinion that JAHI met California's definition of "brain death" was informed by the fact that JAHI had exhibited "deteriorating blood pressures over the past three weeks, ... a testament to [JAHI's] long post-mortem course." (Paragraph 6, Declaration of Heidi Flori, MD, submitted by Defendant Children's Hospital of Oakland in case number 4:13-cv-05993-SBA).

105.    Dr. Flori further stated under oath on that date that based on the information then available to her, JAHI "McMath ... simply cannot regulate life sustaining functions." (Paragraph 8, Declaration of Heidi Flori, MD.)

106.    Dr. Flori stated that the functions which JAHI then could not regulate included the "maintenance of heart rate, temperature, [and] nerve impulses that adjust the tone of blood

vessels and nerves throughout the body." (Paragraph 8, Declaration of Heidi Flori, MD.)

107.    Dr. Flori stated that as JAHI was brain dead "additional and more dramatic signs of [JAHI's] deterioration will continue to manifest over time *regardless of any procedures and regardless of any heroic measures that any facility in the country might attempt.*" (Paragraph 8, Declaration of Heidi Flori, MD, emphasis added).  Dr. Flori termed anticipated deterioration "inevitable the moment [JAHI] died" and stated that "additional medical interventions … may well be counterproductive, perhaps even resulting in expedited cardiopulmonary cessation. (Paragraphs 8, 9, Declaration of Heidi Flori, MD.)

108.    Dr. Flori's predictions were purportedly made "in accordance with accepted medical standards." (California HSC § 7108.)

109.    Over the last two years, JAHI has not exhibited "inevitable" "dramatic … deterioration" and "cardiopulmonary cessation" as predicted by Dr. Flori. Dr. Flori's predictions, which, according to her, happen in all cases of brain death, have not manifest, therefore providing evidence that JAHI is not brain dead.

110.    JAHI's remarkable strength and resiliency despite the serious brain injury she suffered, and her failure to exhibit the predicted deterioration, proves that "in accordance with accepted medical standards," JAHI has not in fact suffered "irreversible cessation of all functions of the entire brain, including the brain stem." (Cal. HSC § 7180.)

111.    The medical evidence that JAHI is alive is uncontroverted and overwhelming. In additional support to those Declarations previously filed by WINKFIELD and her attorneys are declarations from Dr. Calixto Machado a world renowned Neurologist and expert in brain death and from Dr. Alieta Eck, JAHI's current Primary Care Physician, both of whom have seen her within the last 45 days, declaring that JAHI is not dead: not brain dead or otherwise.

23.

112. JAHI exhibits overwhelming evidence of preserved brain structure and of ongoing brain function and activity.

113. JAHI displays evidence of auditory processing and corresponding muscular function. WINKFIELD and MACHADO have observed JAHI's heart rate increase when WINKFIELD enters her room and speaks to her. JAHI moves while listening to her favorite musical artist, Chris Brown, when her room is too cold, and when she hears her best friend from Oakland over the phone. JAHI moves not only her limbs, but moves specific fingers, at her mother's verbal request. Dr. Eck has declared that she has seen this occur in the last several weeks.

114. Numerous medical professionals have declared under penalty of perjury that they have observed evidence of brain function by JAHI on scores of separate occasions.

115. These include observations and assessments of clinical data made by no fewer than five specialists in neurology and neurological surgery, each of whom has examined JAHI or has reviewed her medical records subsequent to the issuance of her death certificate in January, 2014.

116. Each such specialist found objective clinical signs that JAHI did not have at the time when she was declared brain dead as a result of the alleged "irreversible cessation of all functions of the entire brain, including the brain stem" (California Health and Safety Code § 7180).

117. Subsequent to being informed by numerous doctors that JAHI exhibited objective signs of ongoing brain function and that she therefore did not satisfy California's definition of "brain death," Plaintiffs sought the rescission, cancellation, or amendment of JAHI's inaccurate and facially deficient "Certificate of Death."

118. Amendments to and corrections of Birth, Marriage, and Death certificates are governed by California Health and Safety Code § 102250 et seq.

24.

119. California Health and Safety Code § 102250 states in full that "[w]henever the facts are not correctly stated in any certificate of birth, death, fetal death, or marriage already registered, the person asserting that the error exists may make an affidavit under oath stating the changes necessary to make the record correct, that shall be supported by the affidavit of one other credible person having knowledge of the facts, and file it with the state or local registrar."

120. Faced with a death certificate which inaccurately cited 15:00 pm on December 12, 2013, as JAHI's time of death, and in compliance with California Health and Safety Code § 102250, Plaintiffs, through their attorneys requested that changes be made to JAHI's Death Certificate.

121. On May 22, 2015, Plaintiffs' Counsel hand delivered a written request to the California Department of Public Health, which totaled over eighty pages and included affidavits from each of the physicians and neuroscientists referred to above. This document requested that the Department correct JAHI's death certificate.

122. This request contained voluminous medical information, none of which apparently has been evaluated by either the California Department of Public Health or the Alameda County Coroner's Office, which clearly establishes that JAHI has exhibited function of numerous portions of her brain subsequent to the last time when any court was presented any evidence whatsoever of JAHI's brain function (this presentation having occurred in December, 2013).

123. This request was made using the proper form, was accompanied by the appropriate fee, and pointed out some but not all of the deficiencies in the Certificate which are noted above. It was accompanied by affidavits made under oath by not one but five credible physicians and neuroscientists, each of who stated that based on the facts known to him/her, JAHI's death certificate was inaccurate because, using California's definition of brain death, JAHI is not dead.

124.    This submission contained a signed statement, attached hereto as Exhibit "B", under oath

by Daniel Alan Shewmon, MD, a board certified neurologist and then Professor of Medicine

Emeritus at the UCLA Geffen School of Medicine and former Chief of the Neurology

Department at Olive-UCLA Medical Center, that JAHI is not Brain Dead.

125.    Dr. Shewmon noted in his affidavit that JAHI's MRI scan "[did] not even vaguely

resemble [a] chronic brain death [MRI] scan. Rather, it showed vast areas of structurally

relatively preserved brain, particularly the cerebral cortex, basal ganglia, and cerebellum."

126.    Dr. Shewmon noted in his affidavit that JAHI's MRA scan "demonstrated intracranial

blood flow."

127.    Dr. Shewmon noted in his affidavit that JAHI's "medical and nursing records document

that around 8 months after the formal diagnosis of brain death, JAHI underwent menarche, []

had her first menstrual period, ... [and] began breast development." He noted that "[t]he

female menstrual cycle involves hormonal interaction between the hypothalamus (part of the

brain), the pituitary gland, and the ovaries."

128.    Dr. Shewmon contrasted JAHI's undergoing menarche and development of breasts with a

dead body's inability to undergo these brain-modulated changes: "Corpses do not menstruate.

Neither do corpses undergo sexual maturation. Neither is there any precedent in the medical

literature of a brain-dead body developing onset of menarche and thelarche."

129.    Dr. Shewmon stated that "Regardless of [the] potentially esoteric legal debate, any

reasonable person will understand that dead bodies decay; they do not improve in general

health, as JAHI did after transfer [from Children's Hospital of Oakland], nor do they undergo

sexual maturation."

130.    Dr. Shewmon then concluded that "Based on all the information available to [him] to date,

[he is] convinced that (1) JAHI does not fulfill the standard adult or pediatric diagnostic criteria for brain death … and that, moreover, (2) she does not fulfill California's statutory definition of death."

131.    This submission also contained a signed Declaration, attached hereto as Exhibit "C", under oath by Philip DeFina, PhD, a diplomate of the American Board of School Neuropsychology, former Research Assistant Professor, in the Department of Psychiatry at New York University, former Guest Researcher at the National Institute of Mental Health's Laboratory of Clinical and Experimental Neuropsychology, and current Chief Scientific Officer for the International Brain Research Foundation, a non-profit organization which works extensively with brain damaged patients.

132.    Dr. DeFina's Declaration stated that he had arranged for JAHI to undergo a series of tests to determine whether she had ongoing brain function, that he had personally been present at JAHI's diagnostic MRI and EEG testing and that he had reviewed these tests, in addition to discussing JAHI's diagnostic testing and past medical history with many other physicians.

133.    Dr. DeFina's affidavit stated that he had personally applied a BIS monitor (a monitor used during surgery to determine an anesthetized patient's level of consciousness) to JAHI, which indicated "that there was activity of some sort in JAHI's brain," a condition which is inconsistent with a diagnosis of "brain death" under the pertinent California statute.

134.    Dr. DeFina's affidavit stated that he had personally witnessed an EEG which was performed on JAHI subsequent to her discharge from CH, at which time he "saw evidence of brain activity, not brain artifacts, on the EEG."

135.    Dr. DeFina's affidavit stated that he had personally attended JAHI's undergoing a MRI / MRA scan of her brain subsequent to her discharge from CH, at which time he "unequivocally

saw the presence of brain structure" and at which time brain "blood flow was clearly evident. This does not happen if a person is brain dead."

136.    Dr. DeFina's affidavit stated that he was personally aware that JAHI had entered puberty subsequent to her discharge from CH and confirmed Dr. Shewmon's opinion that entering puberty "does not happen if there is the total and irreversible cessation of all neurological function. The hypothalamus and pituitary must be functioning for this to occur. The hypothalamus and pituitary glands are part of the brain. Therefore this means that she is not brain dead."

137.    Dr. DeFina's affidavit stated that he has "many videos where JAHI is responding to specific commands by her mother. This is significant when considered in combination with the EEG findings and MRI/MRA. This is indicative of a patient who is not brain dead."

138.    Dr. DeFina concluded that "It is my professional opinion as a PhD neuroscientist, who has observed hundreds of brain exams, and EEGs and MRIs of brain dead people, that JAHI is not brain dead."

139.    Dr. DeFina provided an explanation for the erroneous determination of death while JAHI was still at CHO: the exam likely "was [performed] under suboptimal conditions and that [JAHI's] brain swelling could have caused her to fail the EEG and cerebral blood flow exams [in December, 2013] and to be unable to move as she does today."

140.    This submission also contained a signed statement, attached hereto as Exhibit "D", under oath by Ivan Mikolaenico, MD, a neurologist who is a member in good standing of the American Academy of Neurology and a member of the Peer Review Committee of the Neurocritical Care Journal.

141.    Dr. Mikolaenico stated under penalty of perjury in his affidavit that he held the following

28.

medical opinions to a reasonable degree of medical certainty and probability:

   a)   The MRA scan obtained after JAHI's discharge from CH showed "some cerebral blood flow which was restored some time after the event [that led to JAHI's acute cardiorespiratory decompensation at CHO]."

   b)   "The brain structure exhibited in [JAHI's] MRI [taken over nine months after her discharge from CH] is not consistent with an MRI of a patient that has been brain dead for over nine (9) months."

   c)   "The EEG [obtained months after JAHI's discharge from CH] shows some electrical brain activity."

   d)   "Based on my review of all information submitted to me and of the testing results performed by other expert witness specialists on JAHI McMath, it is my opinion that she without any doubt has suffered a very significant brain injury which most certainly led to permanent and severe brain damage. However it is my opinion that [JAHI] at this time does not meet the criteria for brain death."

142.   This submission also contained a signed statement, attached hereto as Exhibit "E" under oath by Charles Prestigiacomo, MD, a board certified neurological surgeon who is the Director of Cerebrovascular and Endovascular Neurosurgery at the University of New Jersey Hospital and the Program Director of the Neurosurgical Residency Program at the New Jersey Medical School.

143.   Dr. Prestigiacomo stated in his affidavit, under penalty of perjury, that based on his review of JAHI's MRI and MRA scans, he held the following opinions "to a reasonable degree of medical certainty and probability":

   a)   "The brain structure evidenced in [JAHI's] MRI is not consistent with an

MRI of a patient that has been brain dead over nine (9) months."

    b)    "The MRA [obtained of JAHI approximately nine months after her

diagnosis of brain death] … is inconsistent with the standard definition of brain

death imaging."

    c)    "Based on my review of the testing performed on JAHI McMath it is my

opinion that she suffered a very significant brain injury which will most

certainly lead to permanent and severe brain damage however, it is my opinion

that, at present, she does not meet the imaging criteria for brain death."

144.    This submission also contained a signed statement, attached hereto as Exhibit "F", under

oath by Calixto Machado, MD, PhD, a board certified neurologist who is the President of the

Cuban Commission for the Determination and Certification of Death, the President of the

Cuban Society of Clinical Neurophysiology, and a corresponding Fellow of the American

Academy of Neurology since 1992.

145.    Dr. Machado is an internationally known advocate for the legitimacy of legal definitions of

brain death. He was asked by Dr. DeFina to review JAHI's EEG studies, without being

informed of her legal status or of the notoriety of her case. He has personally observed JAHI

on more than one occasion.

146.    On review of the EEG test performed on JAHI subsequent to the issuance of certificate of

Death Certificate number 002381866, Dr. Machado concluded that the EEG record "is not

consistent with the classical EEG isoelectric pattern found in brain dead cases."

147.    On review of the MRI obtained of JAHI's brain on September 30, 2014, Dr. Machado

concluded that JAHI "had suffered a serious brain injury" but that the MRI "indicat[ed]

preservation of neocortex," which was inconsistent with a diagnosis of "brain dea[th] without

30.

cerebral blood flow since January of 2014."

148.    On review of the MRA obtained of JAHI's brain on September 30, 2014, Dr. Machado concluded that JAHI showed "slow but intracranial cerebral blood flow," again inconsistent with brain death for over nine months.

149.    Dr. Machado analyzed JAHI's heart rate variability (HRV), which he stated "suggests the preservation of functional modulation of HRV by the autonomic nervous system from structures located at the brainstem."

150.    Dr. Machado stated that he had seen evidence "showing the movement of JAHI's foot and hand at the request of her mother, [which was] significant" and that after receiving verbal stimuli from her mother, JAHI "did as she was requested."

151.    Dr. Machado stated that he has never heard of a brain dead person entering menarche.

152.    Dr. Machado concluded that JAHI's physical condition "does not actually fulfill the brain death criteria and hence he/she is not brain dead."

153.    Defendants have refused to consider the substance of Plaintiffs' Request for a Reevaluation of JAHI's Facially Invalid Death Certificate, citing nonexistent statutory requirements and without giving JAHI and WINKFIELD any opportunity to receive due process.

154.    Plaintiffs' May, 2015, request that the California Department of Public Health reevaluate her Certificate of Death was denied by the Deputy Chief of Vital Records, who apparently did not even consider the voluminous medical testimony.

155.    The Deputy instead summarily rejected the Application on the basis of it's not containing certain required special symbols (such as dashes and other similar characters) in its reference to the portions of the death certificate which contained erroneous or inadequate information.

31.

156. Plaintiffs were never provided any documentation of the necessity of filling out their request in this particular manner but rather did their best to comply with this apparently arbitrary and capricious dictate.

157. On May 29, 2015, Plaintiffs resubmitted their request to the California Department of Public Health, employing the special characters and format that they had been instructed to use.

158. This Second Application to the California Department of Public Health was summarily denied on June 10, 2015, without any due process, in a letter from Tony Agurto, MPA, State Registrar and Assistant Deputy Director, Center for Health Statistics and Informatics, California Department of Public Health, wherein Plaintiffs were informed that the Department refused to process their amendment request for three specific reasons, none of which even apparently touched on the substance of Plaintiffs' request for modification: that JAHI McMath was alive.

159. Instead, this refusal to process the request purportedly was based on three inaccurate interpretations of pertinent California law:

    a)    "The signature of the coroner that signed the death certificate is required ... pursuant to HSC section 103300,"

    b)    "The signature of the coroner that signed the death certificate is required to substantiate the reason for the correction," and

    c)    "The information in the death certificate fields that you are proposing to remove ... cannot be made blank or incomplete per HSC Section[s] 102125 [and] 102875."

160. No coroner had ever signed JAHI's death certificate: this was one of the reasons which

32.

WINKFIELD submitted as grounds to declare the Death Certificate invalid and/or to request that the Death Certificate be revoked or amended. Contrary to Agurto's assertion, HSC § 103300 does not "require" the "signature of the coroner that signed the death certificate."

161.    Rather, this statute states in pertinent part that "whenever the information originally furnished in the medical and health data section of any record of death, ... is modified by supplemental information relative thereto, the certifying physician or coroner having knowledge of this information *may* make a declaration as provided in Section 2015.5 of the Code of Civil Procedure stating the changes necessary to make the information correct and file it with the state or local registrar."

162.    Nowhere does this statute require a coroner's signature to correct an inaccurate certificate. In fact, as described in more detail above, not a single Alameda County Coroner had examined JAHI or had personal knowledge relating to JAHI's condition at the time when the death certificate was printed—as above, at a time when Plaintiff WINKFIELD was under extreme duress.

163.    Furthermore, as described above, no certification by a physician having such personal knowledge was included on the certificate, despite a statutory requirement of such an attestation prior to the issuance of a death certificate.

164.    The Department's refusal to process Plaintiffs' request also misstates HSC §§ 102125 and 102875, which the Department purports "cannot be made blank or incomplete per HSC Section[s] 102125 [and] 102875."

165.    First, the death certificate in question is facially deficient in that it leaves many of these sections blank, in violation of both HSC §§ 102125 and 102875, the two statutory sections cited in the Department's refusal to process Plaintiffs' request for correction.

166.    Second, the Department's refusal to process Plaintiff's request is based on an inaccurate interpretation of the cited Code Sections, since HSC §§ 102125 and 102875 describe only the requirements for the initial issuance of a death certificate and do not purport to govern the requirements of an amended certificate (the words "amend" and "amendment" do not even appear in the text of either section).

167.    The Department's refusal to consider Plaintiffs' request materially misrepresents or misinterprets HSC § 102125, which states in its entirety: "All certificates of live birth, fetal death, or death shall be written legibly, in durable black ink, and a certificate is not complete and correct that does not supply all of the items of information called for, or satisfactorily account for their omission."

168.    Notwithstanding the fact that the initial death certificate, which Plaintiffs were only requesting the Department to correct, fails to supply "all of the information called for" on its face and fails satisfactorily [to] account for their omission," had the Department actually provided due process and considered the merits of Plaintiffs' request (JAHI is being denied her basic human rights because of an inaccurate death certificate), surely the certificate could have been amended in a manner which "satisfactorily accounted" for the omission of certain, unspecified, pieces of information.

169.    The Department's letter indicating its refusal to consider Plaintiffs' request failed to provide Plaintiffs an opportunity to request a hearing regarding the Department's inaccurately justified refusal to consider the substance of Plaintiffs' request.

170.    The Department's letter further failed to indicate that any review whatsoever had been made of the substantive issues raised in Plaintiffs' request.

171.    As such, the department's letter indicates that a denial of Plaintiffs' request had been made

34.

1    absent any due process, without a hearing, and without any apparent appeals process.

2    172.    Nevertheless, in an effort to reach a solution to this problem, Plaintiffs contacted the

3    "Customer Service Unit" whose number was given on the denial letter and thereafter

4    attempted to circumvent the need for the instant litigation by attempting to obtain the indicated

5

6    paperwork from the Alameda County Coroner, Mantu Davis, MD.

7    173.    Plaintiff submitted a written request to him at his office on June 18, 2015, along with the

8    over 80 pages of documentation which had been contained in their initial submission to the

9    California Department of Public Health, attached hereto as Exhibit "G."

10   174.    Plaintiffs' received no response from Dr. Davis or from any official of Alameda County

11   through the end of June. Eventually Plaintiff's counsel spo9ke to Dr. Davis who indicated that

12

13   all such requests would have to be made to the Alameda County Coroner's office. Plaintiffs

14   then contacted the Alameda County Coroner's office by telephone to follow up on the request

15   on July 2, 2015.

16   175.    Plaintiffs received no definitive or actionable information from this telephone call, nor did

17   they receive any response to their June 18 letter through mid-August, 2015.  Plaintiffs then

18   contacted the Coroner's office via telephone in August, 2015, and were directed to Alameda

19   County Deputy County Counsel David Nefouse's office.

20

21   176.    On September 1, 2015, Plaintiffs submitted to Mr. Nefouse's office an email, attached

22   hereto as Exhibit "H", which reiterated their request for relief and again included the

23   voluminous documentation which had been sent both to the California Department of Public

24   Health and the Alameda County Coroner's Office.

25

26   177.    Mr. Nefouse responded on September 4, 2015 via email, attached hereto as Exhibit "I",

27   this email again failed to address the substance of Plaintiffs' request for correction of a

28
                                              35.

substantively inaccurate and facially deficient Death Certificate which had been issued by the Alameda County Office of Clerk-Recorder. It also failed to indicate any procedural steps required of Plaintiffs in order to correct this inaccurate vital record. Likewise, it provided no indication of Plaintiffs' due process rights to a hearing or an appeals process. Instead, it directed Plaintiffs to contact another Alameda County Deputy County Counsel, Mr. Scott Dickey, who apparently works with Dr. Davis.

178.    Between their receipt of this email and September 16, 2015, Plaintiffs twice emailed Mr. Dickey, attached hereto as Exhibit "J", requesting his attention to the matter and requesting updates regarding the status of their request to correct a facially deficient and materially inaccurate public document, receiving absolutely no response whatsoever.

179.    On September 23, 2015, having followed the instructions given in his prior email, Plaintiffs again contacted Deputy Alameda County Counsel David Nefouse, attached hereto as Exhibit "K," informing him of the lack of any response from Mr. Dickey, and requesting an update regarding the status of their request.

180.    On October 9, 2015, Plaintiffs finally received a definitive response from Mr. Nefouse, attached hereto as Exhibit "L," which indicated that Alameda County found "no basis to make any changes to and/or nullify or rescind the death certificate of Ms. McMath."

181.    This letter inaccurately described the basis for Plaintiffs' request, which was made on substantive grounds and which relied on information which became available to Plaintiffs subsequent to February 1, 2014, when the letter stated that the County's review of Plaintiffs' "legal materials demonstrates that the Coroner and/or Public Health department ... properly issue[d] the death certificate for Ms. McMath [on January 3, 2013] under the California Health and Safety Code."

36.

182. This letter did not indicate what criteria had been applied in its determination, did not specify any findings of fact or law, did not specify a legal standard of proof that was used, and did not inform Plaintiffs of any appeals procedure available to them. As such, it was arbitrary and capricious and a violation of Plaintiffs' due process rights.

183. This letter failed to address the substantive medical content of Plaintiffs' voluminous submission, rather it seemed to apply something akin to "res judicata" to the ongoing, changing, and improving condition of JAHI McMath's brain function.

184. The letter cited the fact that "on January 17, 2014, Alameda County Superior Court Judge Evilio M. Grillio issued a judgment finding JAHI McMath [on that date] to be brain dead pursuant to California Health and Safety Code sections 7180, 7181" and then summarily asserting that this ruling and meant that "the Coroner and Public Health Department have no legal basis to "rescind, revise, change, or invalidate" the Death Certificate for Ms. McMath."

185. This letter purported to interpret California Health and Safety Code § 7080, which defines brain death as "irreversible cessation of all functions of the entire brain, including the brain stem" in a manner which is at odds with the clear language of the statute, since it appears to ignore overwhelming evidence that JAHI's brain is now functioning.

186. Thus, the "cessation of brain function including the brain stem," which the State Court found sufficient to declare JAHI "brain dead" in December, 2013, has turned out not to be an "irreversible cessation of all functions of the entire brain" but rather, at most, a temporary cessation of some functions of some portions of JAHI's brain.

187. In fact, as described above, JAHI has exhibited, subsequent to the December, 2013, determination of death referred to in Deputy Counsel Nefouse's summary refusal to consider Plaintiffs' submission, medically demonstrable evidence which clearly indicates that JAHI has

37.

manifested, subsequent to December, 2013, function of at least the following areas of the brain: the cerebral cortex, hypothalamus, pituitary gland, basal ganglia, and cerebellum.

188.     This letter also failed to inform Plaintiffs of the process used to arrive at this conclusory legal opinion, or to inform them of any procedural safeguards or appeals process available to them, in order to safeguard JAHI's most fundamental civil right, her very right to life.

189.     As such, this decision was made in violation of the most basic requirements of due process.

### JAHI's Neurological Status Has Continued To Improve.

### JAHI Understands Words.

### JAHI Can Move Her Fingers In Response To Verbal Commands.

190.     Despite having received a summary rejection of her attempts to gain recognition of JAHI's humanity by the State of California, WINKFIELD has continued to care for her daughter, in free exercise of her religious beliefs, in the state of New Jersey.

191.     During the months subsequent to this summary rejection, JAHI has continued to show signs of improving neurological function which of necessity involves the function of numerous portions of her brain.

192.     Dr. Alieta R. Eck, M.D., a licensed physician in the state of New Jersey, is a primary care physician who has been JAHI's physician for the last many months.

193.     Dr. Eck has signed a sworn declaration under penalty of perjury, attached hereto as Exhibit "M," which states that she has examined JAHI on many occasions and has conducted a full physical examination of her.

194.     Dr. Eck further states that she has observed JAHI's physical movements, skin

condition, and has been able to see the display and record of her vital signs.  Dr. Eck has

reviewed documentation maintained by licensed care providers who attend to JAHI daily and

who chart her vital signs and physical presentation.

195.     She has reviewed laboratory data concerning JAHI's blood work which provides

important data regarding her organ functioning.

196.     Dr. Eck has declared under penalty of perjury that she thereby has developed sufficient

data to opine as to whether or not JAHI is a deceased person.

197.     Dr. Eck has declared under penalty of perjury the following: "I have, within the last

month, been physically present when Nailah Winkfield has directed Jahi to move a specific

finger, her third, on a specific hand, and Jahi has responded by doing so."

198.     Dr. Eck has personally observed that JAHI has experienced menarche and has now entered

into puberty.

199.     Dr. Eck's medical opinion is that entering puberty requires functioning of the

hypothalamus, part of the brain. She concludes that because JAHI's hypothalamus is

functioning, she has brain function.

200.     Dr. Eck has made the following conclusion regarding JAHI's current state of brain

function:

"While Jahi McMath has suffered a serious, and significant brain injury, and exhibits the

presentation of one who has suffered serious brain trauma, and exhibits signs and

characteristics of serious brain damage, Jahi McMath is not dead.  She exhibits signs of

brain function.

As Jahi McMath's treating physician, based upon my exam, review of her medical

documentation and my experience, training and expertise, it is my opinion, to a

39.

reasonable degree of medical certainty that Jahi McMath is not dead, including not brain

dead. She has some neurological activity in her brain."

201.    Dr. Calixto Machado, described in the foregoing, prepared an updated sworn declaration

on December 22, 2015, attached hereto as Exhibit "N."

202.    Dr. Machado was physically present with JAHI and WINKFIELD at their home on

numerous occasions, the most recent being November 19, 2015.

203.    At that time, Dr. Machado "had an opportunity to see [JAHI's] mother interact with her

and [to observe JAHI's] responses to her mother's voice.

204.    Based on his personal examination of JAHI, as well as his review of JAHI's copious

medical record, his expert opinion, rendered on December 22, 2015 is as follows:

"1.Jahi McMath has neurologic activity/ brain function in her cerebral hemispheres;

2. Jahi McMath has neurologic activity/ brain function in her brain stem;

3. Jahi McMath, having brain function at both the brain stem and in the cerebral

hemispheres **is not brain dead** as defined under California Law. She has evidence of

brain function some two years after her initial diagnosis therefore she does not have

irreversible cessation of all functions of the entire brain, including the brain stem."

### Plaintiffs Have Exhausted All State Remedies

205.    Having received definitive rejections at both the County and State level, and having been

informed by Alameda County Counsel that there are no additional administrative options for

the reinstatement of JAHI's recognition as a living human being, Plaintiffs are left with no

option but to pursue the vindication of her rights in this Federal forum because of the Federal

constitutional and statutory rights which JAHI has been deprived of without due process of

40.

law.

206.    At this time, Plaintiff WINKFIELD, who was a lifelong resident of Alameda County, California, until she was forced to leave the state in order to secure necessary medical treatment for her child in 2013, wishes to return to California, with her child, JAHI.

207.    Due to the existence of a "Certificate of Death" issued in JAHI's name, and regardless of the numerous procedural and substantive defects to that certificate, which are pointed out in detail in the foregoing, Plaintiff WINKFIELD is informed and believes and thereon alleges that if she were to return to the state of California and if JAHI required medical treatment after her return, she would not be able to obtain necessary medical treatment for her daughter because of the existence of the aforementioned death certificate.

208.    In fact, Plaintiff WINKFIELD is informed and believes and thereon alleges that the existence of this erroneous "Certificate of Death" creates a situation in which no doctor, not even an emergency room doctor in a state-supported facility subject to the requirements of the Federal Emergency Medical Treatment and Active Labor Act (EMTALA), which in general requires any such institution to provide all persons with a medical screening examination to determine whether an emergency medical condition (EMC) exists, regardless of methods of payment, insurance coverage, that patient's citizenship, or her legal status, would be required to provide care for JAHI, no matter the urgency of her physical situation.

209.    Due to her daughter's current state of health, including her constant dependence on a ventilator to support her respiratory drive, Plaintiff WINKFIELD is informed and believes and thereon alleges that her daughter would require medical attention (at the very least she would require immediate orders of a physician licensed to practice in the state of California to maintain specified ventilatory parameters) beginning almost immediately upon her arrival

41.

back in the state of her birth.

210. Plaintiff WINKFIELD further is informed and believes and thereon alleges, based on her prior experience at CH, that if she were to return to California, the refusal of Defendants to correct JAHI's "Certificate of Death" will result in her being faced with a situation in which she would be unable to exercise her religious beliefs, which require her to obtain medical care for her daughter, who, by her sincerely held religious beliefs, is alive as long as she has a spontaneous heartbeat.

211. Therefore, Plaintiffs are left in a situation where they are unable to return to the state of their birth, even on a temporary basis, because of the refusal of Defendants to correct a facially deficient and substantively inaccurate vital document and correct/reverse the determination of brain death which is no longer valid under the definition provided pursuant to California's brain death statute.

## FIRST CAUSE OF ACTION

### (Against All Defendants)

### Civil Action for Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983:

### Violation of the Right to Due Process of Law Guaranteed Under the

### Fifth and Fourteenth Amendments of the United States Constitution

212. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1- 211.

213. Defendants' refusal to amend, correct, or invalidate Certificate of Death number 002381866 apparently was made absent any examination of the voluminous medical submissions made on multiple occasions by Plaintiffs.

214. Defendants' refusal to amend, correct, or invalidate certificate of death number 002381866 was made without giving Plaintiffs notice of the standards by which such decision had been

42.

1  made, without giving Plaintiffs an opportunity to be heard, to present live testimony, and

2  without giving Plaintiffs opportunity for a hearing.

3  215.    Defendants' refusal to amend, correct, or invalidate Certificate of Death number

4  002381866 was made without due process and without the promulgation of any findings of

5  fact or of law reached by a properly appointed administrative body, much less by a neutral

6

7  magistrate or a jury of Plaintiffs' peers.

8  216.    Defendants' refusal to amend, correct, or invalidate Certificate of Death number

9  002381866 was communicated to Plaintiffs in a form that makes it clear that this ministerial

10  decision, which was not reached by any court officer, and which has an immediate and

11  devastating impact on Plaintiffs, is not subject to any formal review or appeals process.

12

13  217.    Each of these factors in Defendants' refusal to amend, correct, or invalidate Certificate of

14  Death number 002381866 is a violation of Plaintiffs' due process rights, which requires that

15  no "State [shall] deprive any person of life, liberty, or property, without due process of law."

16  U.S. Const. Amend. XIV.

17  218.    Defendants' refusal to amend, correct, or invalidate Certificate of Death number

18  002381866 is a refusal to recognize JAHI's status as a live human being. It therefore is a

19  deprivation of: state recognition of her life, of her liberty to return to the state of her birth, and

20

21  of the ability to possess any property.

22  219.    Under existing California Law, Plaintiffs have no legal process, or judicial procedure,

23  available to them under California Law to demonstrate that JAHI has brain function.  Judge

24  Grillo's order has become final, a judgment entered, and the time for appeals under the

25  California Code of Civil Procedure has expired. The Health and Safety Code statutes

26

27  regarding the determination of brain death provide no avenue, or due process, by which a

28

person declared to have a determination "irreversible cessation of all brain function" can provide evidence that they no longer meet the definition as they do have brain function.

220.    These deprivations, committed by state actors in violation of any process whatsoever therefore violate the Fifth and Fourteenth Amendments of the United States Constitutions and are illegal.

221.    Plaintiffs therefore request that this Court issue an injunction requiring Defendants to invalidate Certificate of Death number 002381866, as their refusal to do so was in violation of Plaintiffs' rights to due process under the United States Constitution.

222.    Plaintiffs further seek an injunction requiring Defendants to expunge any and all records relating to the issuance of Certificate of Death number 002381866, in a manner similar to the expunction of a criminal arrest which does not lead to a conviction, as the existence of this erroneous declaration of JAHI's death serves no valid purpose whatsoever and might be used in the future to justify additional or ongoing infringements on Plaintiffs' due process rights.

223.    Plaintiffs further seek an injunction requiring Defendants to restore to JAHI all rights and privileges, including those rights pertaining to health care, and health care benefits, available to each and every other resident and/or citizen of The State of California.

## SECOND CAUSE OF ACTION

### (Against all Defendants)

### Civil Action for Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983:

### Violation of the First Amendment Right of Free Exercise of Religion

224.    Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1- 223.

225.    This action arises under the United States Constitution, particularly under the provisions of the Free Exercise Clause of the First Amendment to the Constitution of the United States.

44.

226. At all times relevant hereto, all defendants acted under color of state law.

227. As described in detail in the foregoing, Plaintiff JAHI has exhibited ongoing evidence of brain activity. She does not now (and therefore did not ever) meet the criteria for being declared dead under pertinent California statute ("irreversible cessation of all brain function.").

228. As described in detail above, Plaintiffs' sincerely held religious beliefs require that they provide ongoing medical care for any person who is alive, including for JAHI McMath.

229. The issuance of a facially invalid (and now substantively inaccurate) death certificate, which does not even include an attestation by any physician who ever examined JAHI, created a situation in which Plaintiffs were unable to exercise their religion, in that the issuance of this certificate allowed any physician in the state of California to withhold needed medical treatment from JAHI.

230. It was the issuance of this invalid and inaccurate death certificate, in conjunction with the pending termination of a California state court restraining order against CHO, which necessitated the relocation of Plaintiffs to another state in January, 2014, solely in order to allow them the ability freely to exercise their religious beliefs which require the provision of medical treatment to all persons with a spontaneous heartbeat.

231. It is only the refusal of Alameda County and of the State of California to correct this inaccurate document, based on the submission of information which was not available at the time of the document's issuance and which has not been controverted in any way shape or form by Defendants, which now prevents Plaintiffs from leaving the state of New Jersey, since this official state-issued document is likely to be given "full faith and credit" by sister states, thus preventing Plaintiffs' free exercise of the dictates of their religious beliefs as described in

45.

the preceding two paragraphs.

232.    The acts complained of herein are being committed by the Defendants, and are depriving

Plaintiffs of their rights to freely exercise their religious beliefs.  Were Plaintiffs to exercise

their constitutional right of free travel among the United States, the denial of these rights

threatens the very existence of JAHI and would completely sever the relationship that still

endures between Latasha and JAHI.

233.    Plaintiffs pray for relief in the form of a declaration of the fact that JAHI McMath did not

suffer, on December 13, 2013, irreversible cessation of all functions of the entire brain,

including the brain stem.

234.    Plaintiffs further pray for relief in the form of a declaration from this court of the fact that

as such, based on the information now available, JAHI McMath is not now "brain dead" by

pertinent California statute.

235.    Plaintiffs further pray for relief in the form of a declaration from this court of the fact that

as such, based on the information now available, JAHI McMath was not ever "brain dead" by

pertinent California statute.

236.    Plaintiffs further pray for relief in the form of a declaration from this court that Plaintiff

Latasha WINKFIELD has the right to exercise control over the determination of the healthcare

to be provided to and received by JAHI McMath, in a manner which is consistent with the free

exercise of both Plaintiffs' religious beliefs.

237.    Plaintiffs further seek an injunction requiring Defendants to invalidate Certificate of Death

number 002381866, as it is facially deficient and as its effect is to deny Plaintiffs the ability

freely to exercise their sincerely held religious beliefs.

238.    Plaintiffs further seek an injunction requiring Defendants to expunge any and all records

COMPLAINT

relating to the issuance of Certificate of Death number 002381866, in a manner similar to the expunction of a criminal arrest which does not lead to a conviction, as the existence of this erroneous declaration of JAHI's death serves no valid purpose whatsoever and might be used in the future to justify additional or ongoing infringements on Plaintiffs' religious freedom.

239.    Plaintiffs further seek any legal or equitable relief deemed appropriate by this Court.

## THIRD CAUSE OF ACTION

### (Against all Defendants)

### Civil Action for Deprivation of Civil Rights in Violation of 42 U.S.C. § 1983:

### Violation of Fourth and Fourteenth Amendment Rights to Privacy

240.    Plaintiffs incorporate herein by reference, paragraphs 1 through 239, as though fully set forth herein.

241.    At all times relevant hereto, all defendants acted under color of state law.

242.    This action arises under the United States Constitution, particularly under the provisions of the Privacy Rights established and recognized as existing within and flowing from Fourth and Fourteenth Amendments to the Constitution of the United States.

243.    The conduct of the Defendants, and each of them, has deprived and is depriving Plaintiffs of the rights of privacy that they have over their medical decisions.

244.    The issuance of a facially invalid (and now substantively inaccurate) death certificate, which does not even include an attestation by any physician who ever examined JAHI, created a situation in which Plaintiff Latasha WINKFIELD was unable to exercise her constitutional right to determine what health care would be provided to her daughter, since after the issuance of death certificate number 002381866, JAHI was "legally dead" and the right to medical care did not apply to her.

47.

245. The issuance of this erroneous and defective certificate allowed then and allows now any physician in the state of California to withhold needed medical treatment from JAHI, despite Plaintiff WINKFIELD's privacy rights which extend to making medical decisions for her incapacitated minor child.

246. It was the issuance of this invalid and inaccurate death certificate, in conjunction with the pending termination of a California state court restraining order against CHO, which necessitated the relocation of Plaintiffs to another state in January, 2014, in order to allow Plaintiff WINKFIELD to require the provision of medical treatment to her daughter, JAHI.

247. It is only the refusal of Alameda County and of the State of California to correct this inaccurate document, based on the submission of information which was not available at the time of the document's issuance and which has not been controverted in any way shape or form by Defendants, which now prevents Plaintiffs from leaving the state of New Jersey, since this official state-issued document is likely to be given "full faith and credit" by sister states, thus preventing Plaintiff WINKFIELD's exercise of her constitutional right to medical decision making as regards her daughter, JAHI.

248. The acts complained of herein are being committed by the Defendants, and are depriving Plaintiffs of their constitutional right to medical decision making. Were Plaintiffs to exercise their constitutional right of free travel among the United States, the denial of these rights threatens the very existence of JAHI and would completely sever the relationship that endures between WINKFIELD and her daughter JAHI.

249. Plaintiffs pray for relief in the form of a declaration of the fact that JAHI McMath did not suffer, on December 13, 2013, irreversible cessation of all functions of the entire brain, including the brain stem.

48.

250. Plaintiffs further pray for relief in the form of a declaration from this court of the fact that as such, based on the information now available, JAHI McMath is not now and was not ever "brain dead" by pertinent California statute.

251. Plaintiffs further pray for relief in the form of a declaration from this court that Plaintiff a WINKFIELD has the right to exercise control over the determination of the healthcare to be provided to and received by JAHI McMath, in a manner which is consistent with the Right to Privacy in the United States Constitution.

252. Plaintiffs further seek an injunction requiring Defendants to invalidate Certificate of Death number 002381866, as it is facially deficient and as its effect is to deny Plaintiffs the ability freely to exercise their constitutional Right to Privacy.

253. Plaintiffs further seek an injunction requiring Defendants to expunge any and all records relating to the issuance of Certificate of Death number 002381866, in a manner similar to the expunction of a criminal arrest which does not lead to a conviction, as the existence of this erroneous declaration of JAHI's death serves no valid purpose whatsoever and might be used in the future to justify additional or ongoing infringements on Plaintiffs' privacy rights.

## FOURTH CAUSE OF ACTION

### (Against all Defendants)

### Violation of Section 504 of the Federal Rehabilitation Act of 1973,

### 29 USC § 794 Et Seq.

254. Plaintiffs incorporate, herein by reference, paragraphs 1 through 253, as though fully set forth herein.

255. At all times relevant hereto, all defendants acted under color of state law.

256. JAHI McMath is a handicapped and/or disabled individual as that term is defined under

49.

the Rehabilitation Act of 1973.

257.    Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against an

"otherwise qualified" handicapped individual, solely by reason of his or her handicap, under

any program or activity receiving federal financial assistance.

258.    The Rehabilitation Act prohibits discrimination against handicapped and/or disabled

individuals by any "department, agency, special purpose district, or other instrumentality of a

State or of a local government" (29 29 USC § 794 ET SEQ.(b)(1)(A)).

259.    Each defendant is either a "department, agency, special purpose district, or other

instrumentality of a State or of a local government" or is an official of such an instrumentality

who was acting in his or her official capacity at all times pertinent to the instant complaint.

260.    The sole reason that Alameda County and/or the State of California issued certificate of

death number 002381866 was because of JAHI's brain injury—her handicap and disability.

261.    JAHI is "otherwise qualified" to receive the full protection of the state of California and of

Alameda County but for the issuance of death certificate number 0023.

262.    Thus, Defendants' refusal to amend, correct, or invalidate certificate of death number

002381866 violates the Rehabilitation Act.

263.    Plaintiffs pray for relief in the form of a declaration of the fact that JAHI McMath did not

suffer, on December 13, 2013, irreversible cessation of all functions of the entire brain,

including the brain stem.

264.    Plaintiffs further pray for relief in the form of a declaration from this court of the fact that

as such, based on the information now available, JAHI McMath is not now and was not ever

"brain dead" by pertinent California statute.

265.    Plaintiffs further pray for relief in the form of a declaration from this court that Plaintiff

50.

Latasha WINKFIELD has the right to exercise control over the determination of the healthcare to be provided to and received by JAHI McMath, in a manner which is consistent with the Right to Privacy in the United States Constitution.

266.     Plaintiffs further seek an injunction requiring Defendants to invalidate Certificate of Death number 002381866, as it is facially deficient and as its effect is to deny Plaintiffs the ability freely to exercise their constitutional Right to Privacy.

267.     Plaintiffs further seek an injunction requiring Defendants to expunge any and all records relating to the issuance of Certificate of Death number 002381866, in a manner similar to the expunction of a criminal arrest which does not lead to a conviction, as the existence of this erroneous declaration of JAHI's death serves no valid purpose whatsoever and might be used in the future to justify additional or ongoing infringements on Plaintiffs' privacy rights.

## **FIFTH CAUSE OF ACTION**

### **(Against all Defendants)**

### **Violation of The Americans With Disabilities Act, 42 U.S.C. §12101 et seq.**

268.     Plaintiffs incorporate, herein by reference, paragraphs 1 through 267, as though fully set herein.

269.     Section 302 of the Americans with Disabilities Act ("ADA") prohibits discrimination against disabled individuals by "public accommodations." 42 U.S.C. § 12182.

270.     A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(2). This includes any physiological disorder or condition affecting the neurological system, musculoskeletal system, or sense organs, among others. 28 C.F.R. § 36.104 (definition of "physical or mental impairment").

51.

271.   Brain damage from lack of oxygen is a disability, because it affects JAHI's neurological

functioning, ability to walk, ability to see or talk and or care for herself.

272.   "Public accommodation" is defined to include a "professional office of a health care

provider, hospital, or other service establishment." 42 U.S.C. § 12181(7). The Hospital is a

public accommodation under the ADA. 28 C.F.R. § 36.104.

273.   Section 302(a) of the ADA states a general rule of nondiscrimination against the disabled:

General rule. No individual shall be discriminated against on the basis of disability in the full

and equal enjoyment of the goods, services, facilities, privileges, advantages, or

accommodation of any place of public accommodations by any person who owns, leases (or

leases to), or operates a place of public accommodation.  42 U.S.C. § 12182(a).

274.   In contrast to the Rehabilitation Act, the ADA does not require that a handicapped

individual be "otherwise qualified" to receive the benefits of participation. Further, section

302(b)(1)(A) of the ADA states that "[i]t shall be discriminatory to subject an individual or

class of individuals on the basis of a disability ... to a denial of the opportunity of the

individual or class to participate in or benefit from the goods, services, facilities, privileges,

advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

275.   By refusing to amend, correct, or invalidate certificate of death number 002381866, and

thereby erroneously classifying JAHI as "brain dead," Defendants are subjecting JAHI

McMath to a denial of the opportunity to benefit from the goods, services, facilities,

privileges, advantages, or accommodations of any hospital or health care facility outside the

states of New Jersey and New York.

276.   This refusal is a violation of the Americans With Disabilities Act, cited immediately

above, since the need to access healthcare has been recognized by the United States Supreme

52.

Court as an "inevitable yet unpredictable need" (Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2619-20 (2012)(J. Ginsburg, concurring)..

277.    Plaintiffs pray for relief in the form of a declaration of the fact that JAHI McMath did not suffer, on December 13, 2013, irreversible cessation of all functions of the entire brain, including the brain stem.

278.    Plaintiffs further pray for relief in the form of a declaration from this court of the fact that as such, based on the information now available, JAHI McMath is not now and was not ever "brain dead" by pertinent California statute.

279.    Plaintiffs further pray for relief in the form of a declaration from this court that Plaintiff JAHI McMath has the right to receive healthcare, in a manner which is consistent with her status as a live human being.

280.    Plaintiffs further seek an injunction requiring Defendants to invalidate Certificate of Death number 002381866, as it is facially deficient and inaccurate.

281.    Plaintiffs further seek an injunction requiring Defendants to expunge any and all records relating to the issuance of Certificate of Death number 002381866, in a manner similar to the expunction of a criminal arrest which does not lead to a conviction, as the existence of this erroneous declaration of JAHI's death serves no valid purpose whatsoever and might be used in the future to justify additional or ongoing infringements on Plaintiffs' privacy rights.

## SIXTH CAUSE OF ACTION

### (Against all Defendants)

### Violation of the Religious Land Use and Institutionalized Persons Act,

### 42 U.S.C. 2000cc et seq.

282.    Plaintiffs incorporate, herein by reference, paragraphs 1 through 281, as though fully set

53.

forth herein

283.     Defendants' issuance of JAHI's "Certificate of Death," which was issued at a time when

JAHI was institutionalized at and was confined in CH imposed a substantial burden on the

religious exercise of both Plaintiffs, as described in more detail above.

284.     This burden was not narrowly tailored to further a compelling governmental interest.

285.     The issuance of this certificate of death by state actors therefore was made in violation of

the Religious Land Use and Institutionalized Persons Act.

286.     Plaintiffs seek relief from this Court in the form of an injunction requiring Defendants to

invalidate Certificate of Death number 002381866, as its issuance violated the Religious Land

Use and Institutionalized Persons Act.

287.     Plaintiffs further seek an injunction requiring Defendants to expunge any and all records

relating to the issuance of Certificate of Death number 002381866, in a manner similar to the

expunction of a criminal arrest which does not lead to a conviction, as the existence of this

erroneous declaration of JAHI's death serves no valid purpose whatsoever and might be used

in the future to justify additional or ongoing infringements on Plaintiffs' religious freedom.

### SEVENTH CAUSE OF ACTION

### (Against all Defendants)

### First Petition for Declaratory Relief (28 U.S.C. § 2201 et seq.)

288.     Plaintiffs incorporate, herein by reference, paragraphs 1 through 287, as though fully set

forth herein.

289.     JAHI McMath, subsequent to the issuance of "Certificate of Death" number 002381866,

has shown unmistakable signs of brain function.

290.     Plaintiffs have presented Defendants with overwhelming evidence that JAHI McMath has

54.

not, since December, 2013, suffered an "irreversible cessation of all functions of the entire brain, including the brain stem" (Ca. HSC § 7180).

291.    As such, Defendants have presented Defendants with overwhelming evidence that, "in accordance with accepted medical standards," JAHI McMath did not, and does not, meet California's definition of "brain death." As such, Defendants have presented Defendants with overwhelming evidence that, "in accordance with accepted medical standards," JAHI McMath does not now meet California's definition of "brain death."

292.    Despite this fact, Defendants apparently have refused even to consider the sworn affidavits of no fewer than five physicians who have reviewed JAHI's voluminous medical records and who are recognized experts in the fields of neurology, neurological surgery, and neuropsychology.

293.    Instead, Defendants appear to have applied arbitrary and capricious standards, which they have justified by citing nonexistent portions of statutes governing the issuance of death certificates and by erroneously citing legal standards which appear to be something akin to the doctrine of res judicata in refusing to consider the substance of Plaintiffs' petitions for correction of the erroneous Certificate of Death.

294.    An actual, present, and justiciable controversy currently exists between Plaintiffs and Defendants regarding this issue, and Plaintiffs are entitled to declaratory relief per 28 U.S.C. § 2201 et seq.

295.    Therefore, Plaintiffs seek declaratory relief from this Court in the form of a judicial declaration that JAHI McMath is not dead and that her Death Certificate is inaccurate, facially deficient, and invalid.

**EIGHTH CAUSE OF ACTION**

COMPLAINT

**(Against All Defendants)**

**Second Petition for Declaratory Relief**
**(28 U.S.C. § 2201 et seq.)**

296.   Plaintiffs incorporate, herein by reference, paragraphs 1 through 295, as though fully set
       forth herein.

297.   JAHI McMath, subsequent to the issuance of "Certificate of Death" number 002381866,
       has shown unmistakable signs of brain activity.

298.   Plaintiffs have presented Defendants with overwhelming evidence that JAHI McMath has
       not, since January 3, 2013, suffered an "irreversible cessation of all functions of the entire
       brain, including the brain stem" (Ca. HSC § 7180).

299.   As such, Defendants have presented Defendants with overwhelming evidence that, "in
       accordance with accepted medical standards," JAHI McMath does not meet California's
       definition of "brain death."

300.   Despite this fact, Defendants apparently have refused even to consider the sworn affidavits
       of no fewer than five physicians who have reviewed JAHI's voluminous medical records and
       who are recognized experts in the fields of neurology, neurological surgery, and
       neuropsychology.

301.   Instead, Defendants appear to have applied arbitrary and capricious standards, which they
       have justified by citing nonexistent portions of statutes governing the issuance of death
       certificates and by erroneously citing legal standards which appear to be something akin to the
       doctrine of res judicata in refusing to consider the substance of Plaintiffs' petitions for
       correction of "Certificate of Death" number 0023.

302.   An actual, present, and justiciable controversy currently exists between Plaintiffs and
       Defendants regarding this issue, and Plaintiffs are entitled to declaratory relief per 28 U.S.C. §

56.

2201 et seq.

303.   Therefore, Plaintiffs seek declaratory relief from this Court in the form of a judicial declaration that JAHI McMath has exhibited by acceptable medical standards clear signs of brain function subsequent to December 23, 2013, and that she does not have irreversible cessation all functions of the entire brain, including the brain stem.

## PRAYER

Wherefore, Plaintiffs pray for judgment against the Defendants as follows:

1.   Injunctive Relief as described above;

2.   Declaratory Relief as described above;

3.   Attorney fees and costs as allowed by statute;

4.   Whatever additional injunctive relief the Court deems appropriate; and

5.   For such other and further relief as the court may deem proper.


Dated: December 23, 2015

                              THE DOLAN LAW FIRM


                              CHRISTOPHER B. DOLAN   *SB 165358*
                              ATTORNEYS FOR JAHI McMATH
                              AND NAILAH WINKFIELD

57.